# In the United States Court of Federal Claims

Nos. 21-1278; 22-1531
Filed: May 27, 2025

_____

|  |  |
|---|---|
| ERIC BEEMAN, *et al.*, | ) |
|  | ) |
|  | ) |
|  | ) |
| *Plaintiffs*, | ) |
|  | ) |
|  | ) |
| v. | ) |
|  | ) |
| THE UNITED STATES, | ) |
|  | ) |
| *Defendant*. | ) |
|  | ) |

_____

*Meghan S. Largent*, Lewis Rice LLC, St. Louis, MO for Plaintiffs, *with whom were Lindsay S.C. Britton* and *Michael Armstrong*, Lewis Rice LLC, St. Louis, MO.

*Ashley M. Carter*, Trial Attorney, United States Department of Justice, Environment & Natural Resources Division, Natural Resources Section, Washington, D.C., *with whom was Todd Kim*, Assistant Attorney General, United States Department of Justice, Environment & Natural Resources Division.

## OPINION AND ORDER

**MEYERS, Judge**.

When rail provided much of this nation's long-haul transportation, railroads often acquired easements over the land on which their lines ran rather than purchasing that land. As technology progressed, other means of transportation supplanted rail lines as the backbone of transportation. As a result, railroads began abandoning their unused lines, which led to a significant contraction of the country's rail network because many easements ended upon the abandonment of rail use. To preserve the rail network for potential reactivation, Congress passed the Trails Act. That act provides that if an eligible trail operator comes forward and expresses its interest in maintaining the rail corridor as a recreational trail, the Surface Transportation Board ("STB") could prevent the abandonment of the rail corridor by issuing a Notice of Interim Trail Use, or "NITU."

It is now firmly established that when the STB issues a NITU pursuant to the Trails Act, a compensable taking often occurs. The taking results when the NITU blocks the extinguishment of the easement, thus taking from the plaintiff the unencumbered right to the land under the rail line. The taking becomes permanent if the railroad and trail use sponsor reach an agreement by which the sponsor takes over responsibility for the rail line to operate a

recreational trail.  These cases are so common that they have garnered their own nickname—the rails-to-trails cases.

This case, however, is one of a small number of cases in which the STB issued a NITU very late in the process, the railroad and potential trail operator did not reach a trail use agreement, and the railroad did not abandon the rail line.  In fact, the railroad in this case is currently seeking authorization to begin running trains across the line again.  Thus, this is perhaps better considered a "rails-to-rails" case in which the court must determine whether the NITU effected a temporary taking of the Plaintiffs' property during the period it was in effect.  To resolve this case, the court must determine whether and when the railroad would have abandoned the rail line but for the NITU.  As a result of factual disputes between the Parties, the court cannot determine whether, much less when, the railroad would have abandoned the rail line at issue.  The court, therefore, denies the cross-motions for summary judgment.

## I.    Background

The portion of the railway ("the Line") at issue in this case sits in Allegany County, Maryland ("the County").[1]  ECF No. 8-1 at 10.  The Eighteen Thirty Group and Georges Creek (collectively, "the railroad")[2] obtained an easement to the Line and spent nearly a decade operating it.  ECF No. 53-1 at 2; ECF No. 53-14.  That changed in early 2020.

In accordance with the Trails Act, 16 U.S.C. § 1247(d), the railroad filed a Verified Notice of Exemption with the STB on February 3, 2020, requesting abandonment authority, and proposing consummation of abandonment on March 24, 2020.  ECF No. 53-2 at 3, 5.[3] Abandonment would entail "removal of the rail, crossties, and possibly the upper layer of ballast."[4]  *Id.* at 19 (citing 49 C.F.R. §§ 1105.7–.8).

On February 21, 2020, the STB served notice of the exemption via publication in the Federal Register.  ECF No. 53-3; *see also* Eighteen Thirty Group, LLC—Abandonment Exemption—in Allegany County, MD.; Georges Creek Railway—Discontinuance Exemption— in Allegany County, MD, 85 Fed. Reg. 10,203 (Feb. 21, 2020).  This would give the railroad

---

[1] The approximately 7.54-mile-long rail corridor is from "from milepost BAI 26.00 in Moscow, MD to 18.46 in Shaft, MD."  ECF No. 53-2 at 2.

[2] Because the specific railroad that received the property is generally not material to the Parties' dispute, the court refers to them as "the railroad" unless an issue depends on the specific railroad company.

[3] The railroad could have filed a standard abandonment application.  49 U.S.C. § 10502. Because it filed a Notice of Exemption, it also certified that "[n]o local traffic has moved over the Line during the past two years" and that "[a]ny overhead traffic on the Line can be and has been rerouted."  ECF No. 53-2 at 9; 49 C.F.R. § 1152.50(b).

[4] Ballast is "gravel or coarse stone used to form the bed of a railroad track or road."  *Ballast*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ballast.

until February 20, 2021, to abandon the Line.[5]  And on March 19, 2020, the STB granted the railroad's request to abandon, effective March 22, 2020.  ECF No. 53-4 at 2.  To finalize the abandonment, the railroad merely had to file a notice of consummation with the STB "to signify that it has exercised the authority granted and fully abandoned" the Line.  ECF No. 53-3 at 5 (citing 49 C.F.R. § 1152.29(e)(2)).  Without such notice, and assuming there were "no legal or regulatory barriers to consummation," abandonment authority would automatically expire.  *Id.* When March 24, 2020, came around—the date the railroad indicated it would abandon the Line—the railroad had not filed a consummation notice, nor does it appear to have removed any rail or crossties from the Line.  In other words, the Line had not been abandoned.

The process continued:

- On December 10, 2020, the County belatedly filed a request for the STB to issue a NITU for the Line.  ECF No. 53-5 at 2.  Although potential trail sponsors must request a NITU within ten days after the STB publishes the notice in the Federal Register, 49 C.F.R. § 1152.29, the County's filing was approximately 290 days after the March 2, 2020 deadline.  The Covid-19 pandemic apparently delayed the County's internal processes.  ECF No. 53-5 at 2–3 (explaining that "it has taken some time for the County to formally establish itself as the sponsor applicant for this trail," because "of the time required to finalize a cooperative relationship with the Maryland Department of Natural Resources ("DNR") . . . , and in part due to administrative delays caused by Covid-19 impacts").

- On January 5, 2021, the railroad agreed to negotiate for interim trail use.  ECF No. 53-6 at 2.

- On February 2, 2021, the County corrected its December 10 request after the STB informed it of a defect in the initial request to fully comply with regulations.[6]  ECF No. 53-7 at 2.[7]

- On February 18, 2021, the STB issued the NITU, granting the railroad and the County the right to negotiate for interim trail use until February 18, 2022.  ECF No. 53-9 at 2.

---

[5] The February 21, 2020 notice contained an error.  It stated that abandonment must be consummated by February 21, 2020, or authority to abandon would expire.  ECF No. 53-3 at 4. The STB noted and corrected this error in its March 20, 2020 decision.  ECF No. 53-4 at 1 n.2 ("The notice erroneously stated the date by which Eighteen Thirty must file its notice of consummation.  The correct deadline for the filing of the notice of the consummation is February 21, 2021.").

[6] The letter entered the public record on February 3 but is dated February 2.  ECF No. 53-7.

[7] The February 2 letter included a supplemental "Statement of Willingness to Assume Financial Responsibility" and noted that interim trail use "was subject to possible future reconstruction and reactivation of the right-of-way for rail service."  *Id.* at 2; ECF No. 53-8 at 2 (explaining that the railroad "ha[d] not consummated abandonment and [was] willing to negotiate" the NITU).

The railroad and the County, pursuant to federal regulations, requested and received two year-long extensions.  ECF No. 53-11; ECF No. 53-12.  Still, they could not reach a trail use agreement.  ECF No. 53-14.  And in the end, they never did reach one.  The NITU expired.

After the NITU's expiration, the railroad had sixty days—until April 18, 2024—to abandon the Line by filing a notice of consummation.  49 C.F.R. § 1152.29(e)(2); ECF No. 53-14.  Although it had the unfettered right to abandon without further delay, the railroad never did.  Instead, the railroad informed the STB that it was *discontinuing* service—i.e. stopping regularly scheduled train service, *see Chicago Coating Co., LLC v. United States*, 892 F.3d 1164, 1166 (Fed. Cir. 2018) (citing *Preseault I*, 494 U.S. at 5 n.3)—but not abandoning the Line.  ECF No. 53-14.  The railroad recently requested authority to restart rail traffic on the Line.  ECF No. 66.

The Plaintiffs own land adjacent to the railroad's right-of-way.  They seek damages from the Government under the Fifth Amendment for the alleged taking of their property without compensation.[8]  ECF No. 8, ¶ 2(a); ECF No. 34.  The Parties have cross-moved for summary judgment.

## II.    Standard of Review

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rules of the Court of Federal Claims ("RCFC") 56(a).  The movant has the initial burden to show that there is no genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A "genuine" dispute of material fact exists where a reasonable jury "could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a "material" fact is one "that might affect the outcome of the suit under governing law," as opposed to "disputes that are irrelevant or unnecessary."  *Id.*

If the movant meets its initial burden, the burden shifts to the nonmovant to show a genuine dispute of material fact.  *Id.* at 256–57.  The nonmovant can do this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  RCFC 56(c)(1).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48 (emphasis in original).  And while the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor[,]" *id.* at 255, the nonmovant's evidence must be "significantly probative" and more than "merely colorable" to defeat summary judgment, *id.* at 249–50.

---

[8] The Plaintiffs also seek fees under the Uniform Relocation Assistance and Real Property Acquisition Policies.  ECF No. 8 at 2, ¶ 2(d).

III.    **Discussion**

A.    **The Trails Act**

The railroad system in the United States runs largely on easements. *See Preseault I*, 494 U.S. at 8 (explaining that "many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests"). Over the last century, as rail service has given way to other modes of transport, the amount of rail lines in use has sharply declined. *See id*. Concerns arose because the abandonment of the rail corridors meant that many easements reverted to the servient landowners, meaning that it would be difficult, if not impossible, to reconstruct these rail lines if the demand for rail transport rebounded. To address these concerns, Congress enacted several statutes to preserve the rights-of-way for railroads. *See id.* at 5–6. The latest statute, the Trails Act, is at issue in this case. 16 U.S.C. §§ 1241–51.

Congress adopted the Trails Act "to preserve shrinking rail trackage by converting unused rights-of-way to recreational trails." *Rogers v. United States* (*Rogers I*), 90 Fed. Cl. 418, 427 (2009) (citing *Preseault I*, 494 U.S. at 5)); *see also* 16 U.S.C. § 1241 *et seq.* Conversion starts with the STB, which possesses exclusive jurisdiction over the country's railroads. 49 U.S.C. § 10501(b). Railroads must get permission from the STB to abandon or discontinue use.[9] The first step of the abandonment process requires the railroad "either (1) file a standard abandonment application with the STB or (2) seek an exemption from filing the application." *Mills v. United States*, 147 Fed. Cl. 339, 344 (2020) (citing *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004)). If the standard abandonment application is approved or the exemption is granted, "the railroad ceases operation, the STB relinquishes jurisdiction over the abandoned railroad right-of-way and state law reversionary property interests, if any, take effect." *Caldwell*, 391 F.3d at 1228.

The Trails Act, through a process known as railbanking, provides "an alternative to abandoning a railroad right-of-way." *Id.* The statute reads, in relevant part:

> [I]n furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way . . . if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.

16 U.S.C. § 1247(d). In other words, a railway converted to a recreational trail does not extinguish an easement. *See Caldwell*, 391 F.3d at 1229. When the railroad and trail operator

---

[9] "Discontinue" and "abandon" are distinct terms of art. To discontinue means to stop rail service but keep the line in the network, meaning the STB retains its jurisdiction. *See Chicago Coating Co.*, 892 F.3d at 1166 (citing *Preseault I*, 494 U.S. at 5 n.3). To abandon means to cease rail service and permanently remove the line from the rail system, which removes the corridor from the STB's jurisdiction. *Id.*

agree to negotiate a potential conversion into a recreational trail, the STB's issuance of the NITU prevents any state law abandonment of the rail corridor. *Caldwell*, 391 F.3d at 1233–34.

The process implicates the Takings Clause of the Fifth Amendment to the United States Constitution, which provides: "Nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Under the Takings Clause, the government owes "just compensation" to landowners when "government action destroys state-defined property rights." *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010); *Caldwell*, 391 F.3d at 1233 (explaining that a taking occurs under the Trails Act when "state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting").

That can happen under the Trails Act in two scenarios. The first is when the negotiation process results in a trail use agreement. *Ladd*, 630 F.3d at 1019 (noting a taking occurs when government action "convert[s] a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement"). The second can happen when the negotiation process is unsuccessful. *Lowery v. United States*, 167 Fed. Cl. 28, 37 (2023) (citing *Ladd*, 630 F.3d at 1025). Thus, a taking can occur when government action "compel[s] the continuation of a railroad-purposes easement to accommodate negotiations for a trail use agreement, even if the negotiations" fail. *Id.*

A taking only occurs, however, if the property owner possesses a cognizable property interest. *Barron v. United States*, 174 Fed. Cl. 114, 121 (2024), *appeal docketed*, No. 25-1179 (Fed. Cir. Nov. 14, 2024); *Bradley v. United States*, 156 Fed. Cl. 640, 648 (2021) (citing *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1348 (Fed. Cir. 2013)). There is a three-prong test used to determine whether a party possesses a cognizable property interest. *Preseault v. United States* (*Preseault II*), 100 F.3d 1525, 1533 (Fed. Cir. 1996) (en banc).[10] The first prong asks who owned the strips of land underlying the railway. *Id.* That is, whether the railroad acquired an easement (or similar property interest that would revert to the landowner in the event of abandonment) or fee simple title. *Id.* Second, if the railroad acquired an easement, the court determines whether "the terms of the easement [were] limited to use for railroad purposes, or did they include future use as public recreational trails." *Id.* And third, "even if the grants of the [r]ailroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking[,] so that the property owners at that time held fee simples unencumbered by the easements[?]" *Id.*

Here, the Parties agree that the railroad acquired only an easement, and that the terms of the easement were limited to use for railroad purposes. ECF No. 53 at 14; ECF No. 54 at 35. The court need not address the third prong because it "applies when the grants of the railroad's easements were broad enough to encompass recreational trails." *Lowery*, 167 Fed. Cl. at 42. Because the Plaintiffs have established the first two prongs, they have established their cognizable property interests—the reversionary interest in the property underlying the Line.

---

[10] The Parties disagree about the interests of eight of the twenty-nine Plaintiffs, but, as the Government explains, "resolution of the taking question could make those issues moot." ECF No. 53 at 9–10 n.2.

The court thus turns to whether the Government's actions amounted to a compensable taking of those interests, and, if it did, the date of the taking. As a general matter, when a trail use agreement is reached, "the issuance of the original NITU triggers the accrual of the cause of action." *Barclay v. United States*, 443 F.3d 1368, 1378 (Fed. Cir. 2006); *Caldwell*, 391 F.3d at 1233–34 (explaining that "the issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way"); *Caquelin v. United States*, 959 F.3d 1360, 1367 (Fed. Cir. 2020) (explaining that a NITU effects a taking because it is a "government action that compel[s] the continuation of an easement . . . intentionally[,]. . . solely for the purpose of seeking to arrange, without the landowner's consent, to continue the easement for still longer, indeed indefinitely, by an actual conversion"). When a trail use agreement is not reached, however, the court must determine whether and when the railroad would have abandoned the Line absent the NITU. *Caquelin*, 959 F.3d at 1363. It is to that inquiry the court now turns.

## B. Disputed issues of material fact preclude summary judgment for either party.

According to the Plaintiffs, they are entitled to summary judgment on liability because the Government has not come forward with evidence to contradict the railroad's clear intent to abandon demonstrated in its application to abandon the Line. For its part, the Government contends that the record is clear that whatever caused the railroad not to abandon the Line was not the NITU. The resolution of these cross-motions requires the court to determine the date of abandonment (if any) in the but-for world without a NITU. *Caquelin*, 959 F.3d at 1372. Because the record before the court leaves the "world without the NITU . . . simply unclear," *Lowery*, 167 Fed. Cl. at 39, the court denies the cross-motions for summary judgment.

For many years, cases "refer[red] simply to the NITU date as the date of the taking." *Caquelin*, 959 F.3d at 1372 (citing *Caldwell*, 391 F.3d at 1235); *see also Barclay*, 443 F.3d at 1378. Under *Caldwell*, *Barclay*, and others, the STB's issuance of the NITU is the event that effected the taking. This makes sense because the STB's issuance of the NITU is the only federal government action in the typical rails-to-trails process that delays abandonment. But that does not mean every NITU constitutes a taking. The cases holding that the NITU constituted the taking are, according to *Caquelin*, "better read . . . as a shorthand that applies where no party has pointed to any legally material difference between the NITU date of issuance (or expiration) and a date of abandonment in the but-for world in which there was no NITU." 959 F.3d at 1372. Ultimately, "there is no taking until the time as of which, had there been no NITU, the railroad would have abandoned the rail line, causing termination of the easement that the NITU continued by law." *Id.* So the court must assess "whether the railroad would have abandoned its line, i.e., relinquished its rights to the rail right-of-way, during the period of the time that the NITU was in effect and was prevented from doing so by the existence of the NITU." *Memmer v. United States*, 50 F.4th 136, 145 (Fed. Cir. 2022).

In *Caquelin*, the Federal Circuit upheld this court's decision finding the railroad would have abandoned its line if the NITU were not in place even though the parties failed to reach a trail use agreement. 959 F.3d at 1363. But this was due to the specific facts in that case, not a general proposition of law. *Caquelin* focused on five pieces of evidence supporting the

conclusion that the railroad would have abandoned the line but for the NITU: (1) a notice of exemption indicating "an affirmative intent to abandon"; (2) a refusal to consent to an extension of the NITU; (3) actual consummation of abandonment; (4) the NITU's authorization to remove track; and (5) the preconditions for abandonment under state law.  *Id.* at 1373.  Furthermore, the government could not point to any evidence affirmatively indicating that the railroad would have delayed abandonment past the issuance of the NITU.  *Id.*  Considering similar evidence in this case, there are clear disputes of material fact that preclude summary judgment.

Start with the railroad's intent to abandon the Line.  Like all rails-to-trails cases, this one began with a petition to abandon the Line.  This often indicates an intent to abandon the rail corridor.  Here, according to the Plaintiffs, the railroad's abandonment application "clearly indicates the [r]ailroad's obvious intent to abandon."  ECF No. 54 at 27, 33.  In fact, the abandonment application includes many references (the Plaintiffs count nearly 100) to the railroad's intent to abandon the Line on or about March 24, 2020.  *Id.* at 29; *see also Caquelin*, 959 F.3d at 1373 (explaining that filing a notice of exemption indicates "an affirmative intent to abandon").  The Plaintiffs attempt to bolster their argument by expending significant ink on whether there is a rebuttable presumption that the railroad would have abandoned the corridor based on the filing of the NITU.

Relying heavily upon *Blevins v. United States*, 158 Fed. Cl. 295 (2022), the Plaintiffs urge the court to recognize a presumption on intent based on the abandonment application.  ECF No. 54 at 24–26.  In *Blevins*, Judge Roumel held that the "issuance of a NITU raises a presumption that the railroad owner would have abandoned the right-of-way absent a NITU."  *Blevins*, 158 Fed. Cl. at 306.  The Government would "then bear[] the burden of demonstrating that the railroad owner would not have abandoned the right-of-way in the 'but-for world' where a NITU never issued."  *Id.*  The Plaintiffs also contend that Judge Roumel's holding was "viewed with approval" by Judge Tapp in *Lowery* and Judge Holte in *Sauer West v. United States*, 168 Fed. Cl. 49 (2023).  ECF No. 54 at 26.  That contention does not hold up.  In *Lowery*, Judge Tapp simply noted the holding in *Blevins*, did not apply it, and then denied cross-motions for summary judgment.  167 Fed. Cl. at 39–40.  And in *Sauer West*, Judge Holte did not cite *Blevins* or discuss a rebuttable presumption.  Rather, he noted that, "[a]bsent evidence supporting a contrary interpretation, the [statements in the notice of exemption's] plain language does indicate the railroad's intent to abandon."  168 Fed. Cl. at 62.

This court takes no stance on whether such a presumption exists because, even if there is a presumption, the Government would overcome it.  The railroad had the unencumbered right to abandon the Line by simply pulling up its tracks and filing a document indicating it had done so.  But it did not.  And there was no NITU in place for almost eleven months after the STB granted the railroad the right to abandon, which undermines the notion that the railroad intended to abandon the Line when it agreed to the trail use negotiations in early 2021.  It may have, but it may not have.

Again, the question for the court is whether and when the railroad would have abandoned the Line but for the NITU.  In most cases, the NITU issues *before* the railroad gets the authority to abandon a rail corridor.  *See* 49 C.F.R. § 1152.29(b)(2) (requiring the filing of a petition by a potential trail operator within 10 or 20 days of the Federal Register notice).  And in this case, the STB's February 21, 2020 Notice states that the exemption—i.e. the abandonment authority—

would become effective on March 22, 2020.  ECF No. 53-3 at 2.  And it provided that any trail use requests under 49 C.F.R. § 1152.29 were due by March 2, 2020.  *Id*. at 2–3.  In other words, a timely application in this case would almost certainly have led to a NITU prior to when the STB granted the railroad the authority to abandon the Line.

But this is not the normal case.  There was no NITU, or even a trail use petition, when the STB's order granted the railroad the unfettered right to abandon the Line effective March 22, 2020.  *See* ECF No. 53-4 at 1.  As a result, the railroad had the authority to abandon the Line without further action of the STB for nearly eleven months before the STB issued the NITU, but the railroad did not abandon.  There is nothing in the record indicating why the railroad changed its mind on at least the timing of its abandonment or what its plans were in early 2021 when it agreed to trail use negotiations.  For that matter, there is no undisputed evidence in the record that clearly establishes the railroad's intent vis-à-vis abandonment at any point while the NITU was in place.

While the Plaintiffs insist that there is no indication that the railroad changed its mind at all, that position is impossible to reconcile with the fact that the railroad did not abandon the Line by March 24, 2020 (as it stated so many times in its notice of exemption that it intended to do), despite the unfettered authority to do so.  It was not until December 10, 2020, that the County first requested the STB issue a NITU.  ECF No. 53-5.  The railroad then agreed to negotiate with the County on January 5, 2021, ECF No. 53-6, and the STB issued the NITU on February 17, 2021.[11]

Based largely on the eleven-month gap between March 22, 2020, when the STB gave the railroad the authority to abandon the Line, and the issuance of the NITU on February 17, 2021, the Government contends that the railroad chose not to abandon the Line for reasons other than the NITU.  That is undeniably true for the period between the abandonment authority and the NITU.  It also casts doubt on the notion that the railroad intended to abandon the Line in February 2021, but it does not resolve the issue.  It is certainly possible that the railroad was aware of the County's delay in submitting a trail use petition and was waiting for the County to be able to do so but maintained an intent to abandon the Line at the same time.  It is equally possible that the railroad was equivocal about abandoning and was testing the waters to determine what options it had available for future use (or disuse) of the Line but was not resolute on abandonment if the negotiations failed or no potential trail operator came forward.  Neither party took discovery of the railroad to find out.

The Plaintiffs contend that the railroad's position is irrelevant.  Not so.  Case law and experience confirm that the railroad's intent is immensely important in deciding whether it would have abandoned the line but for the NITU.  *See, e.g., Blevins*, 158 Fed. Cl. at 308–10 (finding that the railroad would have abandoned the line absent the NITU in part because of a sworn statement from the railroad manager affirming that the railroad "did not expect 'new rail oriented business' to develop"); *Lowery*, 167 Fed. Cl. at 38 (denying cross-motions for summary judgment, in part because the record was devoid of "any statement or averment" by a railroad

---

[11] Recall that the STB required the County to file a corrected request for the NITU and the railroad to affirm its willingness to negotiate a trail use agreement.  These filings were submitted in early February 2021.  ECF No. 53-9 at 1.

representative).  Indeed, the railroad's intent was the key factor in *Hardy v. United States*, 153 Fed. Cl. 287 (2021).  This court, however, does not know why the railroad changed course and chose not to exercise its unencumbered right to abandon the Line during the nearly eleven months before the NITU.  Nor is it clear why the railroad did not abandon the Line after the NITU expired.  Neither side has provided evidence about the railroad's plans or operations to show that abandonment would, or would not, have occurred.

As for the other factors, none changes the court's conclusion.  The second factor asks whether the railroad refused to consent to an extension of the NITU, and the third factor asks whether abandonment was actually consummated.  Under the fourth factor, the court considers whether there was any removal or concrete steps taken to effectuate removal of track.  *See, e.g.*, *Caquelin*, 959 F.3d at 1370 (finding an intent to abandon when the railroad refused to consent to an extension, actually consummated abandonment, and removed track); *Memmer*, 50 F.4th at 142–43 (affirming this court's finding that the railroad would have abandoned the line but for the NITU based in part on an agreement with a materials company to purchase and remove many of the rails on the line, even though the railroad consented to several extensions of the NITU and did not consummate abandonment within sixty days of the NITU's expiration).  And in cases when the removal of tracks is a pre-requisite to abandonment under state law—the fifth factor— the removal of the tracks further indicates an intent to abandon.  *Caquelin*, 959 F.3d at 1373.

Looking at this evidence in this case, the Government contends that the railroad's lack of intent to abandon is clear.  While the railroad twice agreed to extend the NITU, it did not consummate abandonment.  Nor is there "evidence that [the railroad] removed any rails on the line."  ECF No. 53 at 16.  Although the Plaintiffs admit that there is no evidence that the railroad removed any track, they counter that "there is not evidence that they have not."  ECF No. 54 at 32.  The court has since learned that the railroad has filed a petition to resume scenic trains along the line.  *See* ECF No. 66-1 at 2–3.  While this indicates that the railroad most likely did not remove its tracks from the Line, it does not resolve the question.  And given the other factual disputes in this case resolving further factual development and trial, this issue is better left to that process as well.

In the end, the court cannot determine on the record before it whether or when the railroad would have abandoned the Line in this case but for the NITU.  As a result, the resolution of the taking questions in this case is not amenable to resolution on summary judgment.

## IV.    Conclusion

For the foregoing reasons, the court **DENIES** the Government's motion for summary judgment, ECF No. 53, and **DENIES** the Plaintiffs' cross-motion for summary judgment, ECF No. 54.

It is so ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge
